COMMONWEALTH *vs.* MICHAEL FREEMAN.

Norfolk. May 4, 1999. - July 21, 1999.

Present: WILKINS, C.J., LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence,* Admissions and confessions, Motive, Relevancy and materiality, Hearsay, Joint enterprise, Expert opinion. *Practice, Criminal,* Admissions and confessions, Waiver, Capital case, Argument by prosecutor, Assistance of counsel, Instructions to jury. *Homicide. Malice.*

The record of proceedings on a criminal defendant's motion to suppress his confessions to police warranted the judge's conclusions that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights and that the defendant made the statements voluntarily. [115]

At a murder trial, the judge properly excluded evidence of the defendant's claimed prior sexual abuse proffered to establish his asserted post-traumatic stress disorder and resulting lack of criminal responsibility, where there was no credible evidentiary basis for the claimed abuse. [115-117]

At the trial of a murder case, the judge did not err in admitting in evidence a statement of a coventurer made in furtherance of the criminal venture. [117-118]

At a murder trial, expert opinion testimony was properly admitted in evidence by the judge. [118]

At a murder trial, neither the prosecutor's excessive remarks on the credibility of the Commonwealth's psychiatric expert witness nor his argument taken as a whole created a substantial likelihood of a miscarriage of justice. [118-120]

At a murder trial, there was no error in defense counsel's failure to object to certain psychiatric testimony and error, if any, in counsel's failure to submit a written motion for a required finding of not guilty on two indictments would not have influenced the jury's verdict. [120-121]

At a murder trial, the judge clearly, thoroughly, and correctly instructed the jury on murder in the first degree on the theories of deliberate premeditation, felony-murder, and extreme atrocity or cruelty, and on murder in the second degree and manslaughter, and any misstatement or erroneous instruction on the third prong of malice did not create a substantial likelihood of a miscarriage of justice, where no juror could have been confused and where the evidence did not warrant a finding of harm less than a strong likelihood of death. [121-123]

INDICTMENTS found and returned in the Superior Court Department on July 13, 1995.

A pretrial motion to suppress evidence was heard by *R. Malcolm Graham*, J., and the cases were tried before *Barbara A. Dortch-Okara*, J.

*James W. Rosseel* for the defendant.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant appeals from his conviction of murder in the first degree under the theories of deliberate premeditation, felony-murder, and extreme atrocity or cruelty. The jury also found the defendant guilty of armed assault in a dwelling, armed robbery, armed home invasion, armed burglary and assault on an occupant, possession of a sawed-off shotgun, and larceny.[1]

On appeal, the defendant asserts that four issues warrant a reversal of his convictions and a new trial: (1) his statements to the police should have been suppressed because they were not given voluntarily; (2) evidence of his motive was wrongly excluded; (3) a coventurer's statement was improperly admitted; and (4) certain expert testimony was of improper scope. The defendant further asks us to exercise our power under G. L. c. 278, § 33E, because (1) the prosecutor improperly vouched for the credibility of witnesses and appealed to the jury's emotion in closing; (2) he received ineffective assistance of counsel; and (3) the trial judge wrongly instructed the jury concerning murder in the first degree, felony-murder, and malice aforethought. We affirm the defendant's convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* The jury were warranted in finding the following facts. On the night of June 22, 1995, the defendant, Leonard Stanley, and Patrick Morse arrived at Amy McCormack's house in Brockton. The three men had talked about going to beat someone up, and began dressing in black to prepare for the encounter. McCormack overheard the defendant telling Morse that someone "had a lot of guns hidden in the house."

Around midnight, the three men left for a restaurant, where the defendant asked Morse and Stanley if they wanted to commit a robbery. They agreed, and the defendant proceeded to plan the robbery and to explain how they would enter the house.

---

[1]The larceny conviction was placed on file with the defendant's consent and is not before us on appeal. See *Commonwealth* v. *Accetta*, 422 Mass. 642, 642 (1996).

He told the others that he had two knives with him that he planned to bring to the house.

The defendant entered the victim's house through an open rear window, and let the other two men in through the rear door. He walked into the victim's bedroom, where the victim was sleeping, turned on the light, and began assaulting him with a knife. The victim awoke and attempted to defend himself. The defendant shoved his hand down the victim's throat and yelled at him. At one point, the defendant lost his knife and asked the others to pass him another one, which he used to continue stabbing the victim. The victim died of approximately twenty-three stab and incised wounds.

After the victim was dead, the three men stole his shotgun and returned to McCormack's house, where McCormack saw a bloody knife in a dog's water bowl. Stanley went to sleep as McCormack, Morse, and the defendant talked about what had happened. Morse and the defendant described the attack to McCormack. They told her that they had gone to the victim's house, where the defendant walked into the victim's bedroom, lost control, began yelling and screaming, and stabbed the victim with two knives.

After telling McCormack what they had done, Morse and the defendant disposed of the defendant's bloody clothes, cleaned out Morse's car, and returned to the victim's house in an attempt to wipe off any fingerprints. The two men then left the car near a friend's home and threw one of the knives into the woods. Later that day, the defendant told several people that he had killed someone. He also showed his girl friend one of the bloodstained knives, and said, "You could still smell the blood on it."

One day after the attack, a friend of the victim discovered the body. The police investigation soon focused on the defendant, Morse, and Stanley. On June 25, an arrest warrant was issued for the defendant. He avoided arrest by hiding in the woods near Brockton until June 29. After he was apprehended, the defendant gave three separate statements in which he confessed to the murder.

2. *Motion to suppress.* The defendant unsuccessfully attempted to suppress the statements he gave to the police on the day of his arrest. On appeal, he contends that the motion judge should have suppressed the statements because the lack of food, sleep, and water he endured while "having lived in the woods"

for four days prior to his arrest made him unable either to waive his Miranda rights, or to make the statements voluntarily. He also argues that the police erred by not recording the statements electronically.

We summarize the motion judge's findings of fact, which were amply supported by the evidence. See *Commonwealth* v. *Rankins*, 429 Mass. 470, 471 (1999). The defendant was arrested, and brought to the Brockton police department. The defendant alleged that he had been without food or water for the four days he was in the woods, but he did not mention the lack of food or water as the reason for going to his friend's house. Instead, he only asked to clean up and make a telephone call. Although he appeared unkempt, the defendant was quite lucid, responsive, and aware of his surroundings. He was given a soda and some food, of which he only ate a portion. He remained coherent throughout the interview. Police officers informed him, both orally and in writing, of his Miranda rights, which he waived, both orally and in writing. After the defendant gave a partial statement, in which he discussed having planned the robbery, he was moved to another police station, where he again was read his Miranda rights, waived them, orally and in writing, and gave another incriminating statement concerning his involvement in the murder. Later that evening, at the defendant's request, he spoke with a police officer, at which time his Miranda rights were read and orally waived again. He then stated that the victim had raped him when he was a child, and that this had prompted his attack.

A waiver of the right to counsel and the right to remain silent must be made voluntarily, knowingly, and intelligently in order to be valid. See *Commonwealth* v. *Rankins, supra* at 473. The inquiry is twofold — (1) whether the defendant knowingly and intelligently waived his Miranda rights and (2) whether the statements were made voluntarily. See *Commonwealth* v. *Mello*, 420 Mass. 375, 383 (1995), citing *Commonwealth* v. *Parham*, 390 Mass. 833, 838 (1984). In making this determination, the court "must examine the totality of the circumstances surrounding the making of the waiver." *Commonwealth* v. *Pucillo*, 427 Mass. 108, 110 (1998), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996). Relevant factors for this inquiry include "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and

mental condition, the initiator of the discussion of a deal or leniency . . . and the details of the interrogation, including the recitation of Miranda warnings." *Id.*, quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

The judge was warranted in concluding that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The defendant orally waived his rights when they were read to him on three separate occasions, and he also signed a waiver card each time he was presented with one. Moreover, the defendant makes no claim that the police threatened or harmed him, or otherwise tainted the procurement of the waiver through coercion. See *Commonwealth* v. *Mello, supra* at 384-385, and cases cited.

The record also supports the motion judge's conclusion that the defendant made the statements voluntarily. Interviewing police officers testified that, although the defendant appeared disheveled and dirty, he was articulate and "aware of his circumstances and surroundings" throughout the questioning. Moreover, the defendant's claim of extreme hunger is undermined because he ate and drank during the interviews. In fact, he was given a sandwich at one interview but did not finish it.

Our recent cases refute the defendant's contention that the motion to suppress should have been granted because his interview with police was not recorded electronically. See *Commonwealth* v. *Ardon*, 428 Mass. 496, 498 (1998) (declining to require electronic recording of police interrogations); *Commonwealth* v. *Fernandes*, 427 Mass. 90, 98 & n.3 (1998) (any requirement of electronic recording, even if appropriate in future, would not be retroactive). See also *Commonwealth* v. *Diaz*, 422 Mass. 269, 271-273 (1996) (discussing issue in detail).

3. *Evidentiary rulings.* The defendant alleges three evidentiary rulings violated his due process right to present a proper defense. Because the evidentiary challenges were preserved properly, we review the rulings for prejudicial error. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 172, cert. denied, 525 U.S. 1007 (1998), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). We find no prejudicial error that would warrant a new trial.

a. *Exclusion of prior sexual abuse evidence.* At trial, the defendant's primary argument was that he suffered from post-traumatic stress disorder, as a result of being raped by the

victim, and, therefore, he lacked the mental capacity to be convicted of murder in the first degree.

The defense attempted to corroborate his rape allegation through the testimony of two of his friends. Over an objection, the judge permitted the witnesses to testify that the defendant had told them that he had been molested, but she did not allow them to testify that the rapist was his mother's boy friend. The defendant claims the evidence was especially relevant and was akin to evidence of motive, which is generally admissible. See *Commonwealth* v. *Ashley*, 427 Mass. 620, 624 (1998).

The judge properly excluded testimony that the defendant's mother's boy friend was the man who had raped him.[2] Because there was no evidence that the victim was the mother's boy friend, it was within the judge's discretion to exclude this evidence as too remote or prejudicial. The statement is speculative in the absence of evidence that the victim was in fact the defendant's mother's boy friend. The judge stated that the testimony might be admitted if the defense could proffer other evidence to identify the boy friend as the victim, such as evidence that the boy friend, like the victim, was disabled. The defense was not able to do so.[3]

In addition to the failure to support its assertion that the victim was the mother's boy friend, credible evidence contradicted the defense position and supported the judge's decision to limit the testimony. For instance, several witnesses stated that the victim and the defendant's mother were "just friends." Further, the general rule cited by the defendant, which favors admission of evidence of motive, does not permit the defendant to support his diminished capacity claim with evidence of mo-

---

[2] In fact, the judge could have excluded the statement entirely as hearsay, because the defendant tried to use the witnesses's testimony to prove that he had been raped by the victim. "An extrajudicial statement of a declarant is not ordinarily admissible if it is a statement of memory or belief to prove the fact remembered or believed." See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 510 (1997), quoting *Commonwealth* v. *Lowe*, 391 Mass. 97, 104, cert. denied, 469 U.S. 840 (1984).

[3] On the day of his arrest, after being advised of his Miranda rights, the defendant confessed to the murder in two separate conversations with police. Later, more than two hours after his arrest, he initiated a third conversation, in which he stated for the first time that he had killed the victim because she victim had raped him when he was a teenager. This statement was in evidence when the judge limited the testimony concerning the mother's boy friend. However, it does not change our conclusion because the defendant did not describe the victim as the mother's boy friend in his statement.

tive. See *Commonwealth* v. *Ashley, supra* at 624; *Commonwealth* v. *St. Germain,* 381 Mass. 256, 271 (1980). Because no evidence was introduced to support the defendant's claim that he had been raped by his mother's boy friend and that the victim was his mother's boy friend, limiting the testimony of the defense witnesses was proper.

b. *Admission of coventurer's statement.* When the three men returned to McCormack's home after the murder, Stanley went to sleep. The Commonwealth called McCormack to testify that she observed Stanley, after he awoke, apologize to the defendant, saying that he could not sleep because the "cops were on their way, because he knew that it had been planned out for some time." It is unclear whether the defendant responded to Stanley's remarks. The defendant argues that Mc-Cormack's testimony was improperly admitted hearsay. The Commonwealth asserts the statements were properly admitted as either a statement of a coventurer, or an adoptive admission.

Statements made between or among coventurers are admissible hearsay evidence "if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White,* 370 Mass. 703, 708-709 (1976). "The joint venture provides a commonality of interests because of which the statements bear indicia of reliability." *Commonwealth* v. *Collado,* 426 Mass. 675, 681 (1998), citing *Commonwealth* v. *Colon-Cruz, supra.* The rule applies to statements made subsequent to the crime, including when the coventurers are attempting to evade arrest. See *Commonwealth* v. *Colon-Cruz, supra* at 545.

It was not error to admit in evidence Stanley's statements. In important respects, this testimony was similar to the coventurers' statements that were admissible in ·*Colon-Cruz.* In both cases, the statements were made when the cooperative effort was in progress, after the coventurers retreated immediately following the crime. See *id.* at 545. In addition, the discussions were in furtherance of the venture. In the *Colon-Cruz* case, the coventurers were attempting "to avoid detection and detention," and they were discussing a plan to escape. *Id.* Similarly, in this

case, Stanley warned the defendant that "the cops were on their way," when the defendant was trying to evade authorities.[4]

c. *Admission of expert testimony.* On the morning after the attack, the defendant and Morse took a hacksaw and removed the barrel of the shotgun that the men had stolen from the victim. At trial, an expert testified that concealment was the most likely purpose of a sawed-off shotgun. The defendant argues that this opinion was irrelevant, and admission of the statement was prejudicial because it suggested that he "was a bad person." We disagree. The expert witness's opinion that the purpose of a sawed-off shotgun is "mainly concealment" in no way commented on the defendant's character. Instead, the testimony more likely implied that the defendant attempted to change the shotgun's appearance because he was conscious of his guilt, or indicated that the defendant intended to use the shotgun in the future. Admission of this testimony was within the judge's "broad discretion with respect to the admission of expert testimony." *Commonwealth* v. *Woods,* 419 Mass. 366, 374 (1995), and cases cited. Even if this evidence should not have been admitted, it would not have been prejudicial error, given the strong evidence against the defendant.

4. *Review under G. L. c. 278, § 33E.* Finally, the defendant asks us to exercise our power under G. L. c. 278, § 33E, either to reduce the murder conviction or to order a new trial. We conclude that none of the arguments merits relief.

a. *The prosecutor's closing argument.* The defendant contends the prosecutor improperly vouched for the credibility of the psychiatric witness and inappropriately played to the emotions of the jury concerning the defendant's criminal responsibility.

"Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Passley,* 428 Mass. 832, 835 (1999), quoting *Commonwealth* v. *Viriyahiranpaiboon,* 412 Mass. 224, 231 (1992). Arguments based on testimony submitted at trial and its logical conclusions are proper, see *Commonwealth* v. *Lyons,* 426 Mass. 466, 473 (1998), citing *Commonwealth* v. *Curtiss,* 424 Mass. 78, 83 (1997).

A prosecutor can address, in a closing argument, a witness's

---

[4]Because we conclude the testimony was admissible as a statement of a coventurer, we need not address whether it was admissible as an adoptive admission.

demeanor, motive for testifying, and believability, provided that such remarks are based on the evidence, or fair inferences drawn from it, and are not based on the prosecutor's personal beliefs. See *Commonwealth* v. *Pearce*, 427 Mass. 642, 644 (1998). When credibility is an issue before the jury, "it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Commonwealth* v. *Raymond*, 424 Mass. 382, 391 (1997), quoting *Commonwealth* v. *Thomas*, 401 Mass. 109, 116 (1987).

The prosecutor's comments[5] concerning Dr. Kelly, such as, he is "the best there is" and "we want the best and that's who you heard from yesterday" were based on the prosecutor's personal beliefs and not from the evidence. In this respect, he exceeded the permissible bounds of a closing argument.

While we do not condone the type of argument exhibited here, we cannot say that it created a substantial likelihood of a miscarriage of justice. The prosecutor's remarks, although excessive, were directed at Dr. Kelly's believability, an issue raised by the defense and contested by both sides. The statements presented arguments already in evidence and stressed the jury's role of evaluating credibility. Because the effect of the

---

[5] The prosecutor commented on Dr. Kelly's testimony as follows:

"You don't have to accept any expert's testimony. Just take it all. Take part of it. Take none of it. Dr. Kelly — let me digress for a second because my Brother brought this up. When Dr. Kelly first took the stand, he was asked by my Brother, well you represented or you testified in this case and you testified in that case, and you testified in this case all for the Commonwealth. . . . Of course Dr. Kelly testifies for the Commonwealth. He testifies in Suffolk County; he testifies in Middlesex County; he testifies in Norfolk County; he testifies in Essex County; he testifies straight across the Commonwealth for District Attorneys' Offices. Not only for the District Attorneys' Offices, but you also heard that Dr. Kelly testifies for the United States Attorney's Office, the federal government. They can have their pick of any psychiatrist in the country. Who do they pick? Dr. Martin Kelly, because I submit to you because he's a premiere forensic psychiatrist in this state, if not the country. He's the best there is. And that's why the District Attorneys' Offices and the federal government try to retain Dr. Kelly. Full professor at Harvard in psychiatry. You don't go much higher than that, and that's why he does testify, and that's why he does testify a lot for the Commonwealth. We try to get the best. And in a case like this, which I submit to you is a vicious and violent homicide, we want the best and that's who you heard from yesterday."

statements was minimized both by the prosecutor, who told the jury that they "[need not] accept any expert's testimony," and by the judge, who instructed the jury of their burden to assess credibility independently and that "opening statements and the closing arguments of the attorneys are not the evidence in the case," see *Commonwealth* v. *Kent K.*, 427 Mass. 754, 761 & n.7 (1998), we conclude these comments did not create a substantial likelihood of miscarriage of justice.

Neither did the prosecutor's remarks concerning the defendant's accountability for his actions result in a substantial likelihood of a miscarriage of justice.[6] These statements were "characteristic of 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole,' and did not cross the line between fair and improper argument." *Commonwealth* v. *Lyons, supra* at 472, quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997). His comments were appropriate because evidence pertaining to criminal responsibility had been at issue in the case. See *Commonwealth* v. *Kent K., supra* at 759-760 (prosecutor's argument based on issue at trial); *Commonwealth* v. *Hartford*, 425 Mass. 378, 381 (1997) (prosecutor's statement that defendant was acting out his sexual fantasies in felony-murder was reasonable inference from facts). The prosecutor's argument, taken as a whole, did not create a substantial likelihood of a miscarriage of justice.

b. *Ineffective assistance of counsel.* The defendant argues that his trial counsel's failure to object to Dr. Kelly's ability to testify about his psychiatric test results due to lack of knowledge constituted ineffective assistance of counsel. Because the standard of review under G. L. c. 278, § 33E, is more favorable to the defendant than our constitutional standard for determining ineffective assistance of counsel claims, we review the defendant's claim for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Sena*, 429 Mass. 590, 594 (1999), and cases cited. Under this standard, we determine whether there was an error, and if there was, then "a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

---

[6]The prosecutor stated: "This whole case is about accountability and responsibility. It's about time in twenty-one years [the defendant] had to accept responsibility for his actions. He must be held responsible for what he did."

We conclude that defense counsel did not err by failing to object to the psychiatric testimony, and therefore, this did not create a substantial likelihood of a miscarriage of justice. The testimony in question dealt with Dr. Kelly's reading of the defendant's psychiatric test results. Although Dr. Kelly was not familiar with the test, this lack of familiarity was established, and defense counsel had an opportunity to cross-examine the witness to rebut his readings of the test. Even if this was error, it would not have had an impact on the trial. The judge's ruling was well within her discretion, see *Commonwealth* v. *Woods*, *supra* at 374. There could be no prejudice to the defendant where, as appellate counsel concedes in his brief, even if objections had been raised and overruled, the decision would have been within the judge's discretion.

The defendant also alleges his trial counsel erred by not submitting a written motion for a required finding of not guilty on the indictments charging possession of a sawed-off shotgun and larceny of a firearm. From our review of the record, we conclude that the jury's conclusion would not have been different if counsel had made the written motion.

c. *Jury instructions*. The defendant argues that the judge erred by instructing the jury to consider murder in the first degree and then murder in the second degree, instead of first instructing them to consider whether he was guilty of murder before examining the appropriate degree of murder. He also asserts that her instructions on the third prong of malice were improper and that both errors created a substantial likelihood of a miscarriage of justice. We disagree.

In a challenge to jury instructions, "[w]e look to the charge as a whole to determine whether it fairly instructs the jury." *Commonwealth* v. *Richardson*, 429 Mass. 182, 185 (1999), quoting *Commonwealth* v. *Raymond*, *supra* at 386. "We consider what a 'reasonable juror could have interpreted the instruction' to mean." *Id.*, quoting *Commonwealth* v. *Raymond*, *supra* at 386.

The judge incorrectly instructed the jury because the "jury should be instructed first to decide whether the defendant is guilty of murder and, if so, then to decide whether the defendant is guilty of murder in the first degree." *Commonwealth* v. *Sama*, 411 Mass. 293, 300 (1991). The jury then determine whether the defendant is guilty of murder in the first degree, and, if he or she is not, then whether the defendant is guilty of murder in the second degree. See *id.*

The jury were well instructed as to their responsibility, despite this discrepancy. The judge first defined murder. She then told the jury to consider murder in the first degree, and fully explained the elements. She then explained that, if the jury did not find sufficient proof of murder in the first degree, they should consider murder in the second degree. The jury were informed of the required elements of each offense and urged to ensure the elements were satisfied before reaching their verdict. The jury convicted the defendant under all three types of murder in the first degree after receiving clear and thorough definitions on murder in the first and second degrees.

This case is unlike *Commonwealth* v. *Sama, supra,* where we concluded that a new trial was required due to confusion created because the judge instructed, first, on murder in the second degree, and then on murder in the first degree. *Id.* at 299-300. In the present case, a reasonable juror would have determined if the evidence supported each of the three forms of murder in the first degree and, if not, whether the evidence supported a conviction on murder in the second degree. That a juror would not have determined whether the evidence supported a conviction for murder before considering the degrees did not create confusion on par with that created in *Sama.* Misstatements of this type have been held not to create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Richardson, supra* at 186; *Commonwealth* v. *Raymond, supra* at 385-387. A reasonable juror would not have been confused as to the requisite elements for conviction because the judge clearly defined murder, murder in the first degree, murder in the second degree, and manslaughter. We conclude, therefore, that there was no substantial likelihood of a miscarriage of justice.

The defendant also argues that the judge's instruction on the third prong of malice was improper because it defined malice to include the likelihood of grievous bodily harm. Although the judge's instructions were erroneous, they did not create a substantial likelihood of a miscarriage of justice. The proper definition of the third prong of malice is, "in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Williams,* 428 Mass. 383, 385-386 (1998), quoting *Commonwealth* v. *Grey,* 399 Mass. 469, 470 n.1 (1987). Anything less than a strong likelihood of

death is insufficient to support the third prong of malice, and, therefore, inclusion of "or grievous bodily harm" is error. See *Commonwealth v. Williams, supra* at 386, and cases cited; *Commonwealth v. Vizcarrondo,* 427 Mass. 392, 395-396 & n.5 (1998), and cases cited. Yet, "where the defendant's attack is inherently deadly, the lowering of the third prong malice standard to include grievous bodily harm may be nonprejudicial." *Commonwealth v. Williams, supra* at 387. Compare *Commonwealth v. Murphy,* 426 Mass. 395, 401 (1998) (conviction upheld because act could not have created less than strong likelihood of death); *Commonwealth v. Fryar,* 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997) (same); *Commonwealth v. Mello, supra* at 390 (same), with *Commonwealth v. Williams, supra* at 387 (conviction reversed because act could have warranted a finding of less than strong likelihood of death); *Commonwealth v. Vizcarrondo, supra* at 397-398 (same).

The erroneous grievous bodily harm language in the malice instruction was not prejudicial. We have previously concluded that the evidence that a defendant stabbed a victim does not warrant a finding of a risk of harm less than a strong likelihood of death. See *Commonwealth v. Murphy, supra* at 401; *Commonwealth v. Fryar, supra* at 248. The victim here was repeatedly and violently stabbed in the head, neck, and chest at least twenty-three times. The victim struggled greatly, and was alive during a large portion of the attack. "The evidence does not warrant a finding of a risk of harm less than a strong likelihood of death." *Id.*

Aside from the issues addressed above, the defendant does not challenge his conviction of murder in the first degree based on a theory of extreme atrocity or cruelty. We, therefore, uphold the defendant's conviction of murder on that basis, and need not address challenges to his convictions of murder based on felony-murder and deliberate premeditation. See *Commonwealth v. Judge,* 420 Mass. 433, 444 (1995).

5. *Conclusion.* We affirm the defendant's convictions and affirm the denial of the motion to suppress.

*Judgments affirmed.*